NEWMAN, Circuit Judge,
dissenting.
Without doubt, the question of obviousness here presented is a close call. However, when the question is close, when it turns on findings and interpretations of biologic and medicinal evidence, when the application of law to fact invokes the policy of the patent statute to advance the useful arts, then the findings and rulings of the trial court warrant particular attention on appellate review.
Here, the district court fully explored the evidence relating to whether it would have been obvious to increase by 300% the concentration of the active ingredient ada-palene without increasing its known adverse side effects. The district judge held an eight-day bench trial, heard thirteen live witnesses including expert witnesses of stature and experience, and received evidence and argument from both sides. The court issued an opinion with over 50 pages on the issue of obviousness, finding the facts and weighing the evidence and applying the law with thoughtful explanation and reasoning.[1]
My colleagues on this panel give scant attention to the district court’s analysis, instead making their own findings, and applying flawed procedural and' substantive law. My colleagues ’ do not identify clear error in the district court’s findings; instead they distort the burdens of proof and production, ignore the applicable standard of proof and rely on their own factual determinations and creative theories of law, and eradicate the patent.
The district court ruled that there was not clear and convincing evidence of invalidity. By contrast, my colleagues announce their rule whereby a broad teaching that includes the patented invention removes the statutory presumption of validity, and without more establishes obviousness. See maj. op. at 737-38 (“where there is a range disclosed in the prior art, and the claimed invention falls within that range, the burden of production falls upon the patentee ... ”). Although the majority mentions the requirement of clear and convincing evidence of invalidity, the majority presumes that the prior art establishes invalidity, and places on the patentee the burden of establishing patentability based on “secondary considerations.” The majority goes on to impose a new and unprecedented view of these considerations.
For example, although the panel majority concedes that there are unexpected results for the concentration selected by the patentee, see maj. op. at 739 (“we agree that this result was unexpected”), my colleagues do not require the patent challenger to show any reason in the prior art (or common sense) for selection of this embodiment with its unexpected properties. Rather, they hold that unless a skilled artisan was not “capable of adjusting the percentage,” id., the extent of the change in percentage (here 300%) and the unex *742 pected results and properties are irrelevant to patentability.
In refusing to credit any of the demonstrated “secondary considerations” my colleagues foreclose patentability to a vast body of improvement patents. In the field of medicaments, the denial of patentability for improvements is a disincentive to the development of such improvements. The losers are those afflicted with disease. I respectfully dissent.
Discussion
Particularly for close questions of pat-entability, the district court’s findings and assessments of credibility and weight of evidence, and the district court’s application of law to found facts, compel appellate attention. The role of the trial court in considering the evidence that each party provides through examination and cross-examination of witnesses and documents, with judicial elaboration and interaction, cannot be matched on appeal. As the Supreme Court stated in Anderson v. Bessemer City, “duplication of the trial judge’s efforts in the court of .appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources.” 470 U.S. 564, 574-75, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).
Clear and convincing evidence is required to overcome the statutory presumption of validity of a duly granted patent. See 35 U.S.C. § 282 (a patent is presumed valid); Cardinal Chem. Co. v. Morton Int’l, 508 U.S. 83, 93 n. 15, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993) (invalidity must be proved by clear and convincing evidence). Here the panel* majority does not provide clear and convincing evidence of invalidity. Instead, the majority discards the trial judge’s findings on the premise of a presumption of invalidity that the majority applies to “selection” inventions, that is, inventions within a known class or range of technology, for which the majority discards the established procedural and substantive burdens. The majority makes its own factual findings, and writes new law.
In contrast to the panel majority’s dismissive analysis, the district court’s findings reflect careful examination of all of the evidence. Nonetheless, my colleagues conclude that the selection of a 300% increase in dosage was obvious, after the unexpected properties of the increase were discovered by this patentee. I summarize some of the evidence before the district court, whose findings well support the conclusion that invalidity on the ground of obviousness was not established by clear and convincing evidence:
I
The Pkior Art
In this Hatch-Waxman case, Tolmar, Inc. seeks to invalidate Galderma’s patents on the commercially successful acne medication whose active ingredient is the reti-noid adapalene in 0.3% concentration. There was extensive prior art showing re-tinoids including adapalene in a range of concentrations for various uses, and showing the prior selection of 0.1% adapalene for treatment of acne because higher concentrations were shown to be unduly irri-tative to acne-ridden skin.
The district court found that the knowledge in the field taught away from the 0.3% concentration, based on the expert testimony and documentary evidence at trial. The district court, applying the correct standard, held that Tolmar did not prove invalidity by clear and convincing evidence.
*743 The Shroot Patents (1988, 1992, 1993)[2]
These are Galderma’s now-expired patents on benzonaphthalene derivatives including adapalene, and their use to treat acne. The issue is the selection of the 0.3% adapalene concentration in the patents-in-suit.
The district court found that “the [Shroot] range of 0.0005% to 5% for topical compositions covers four orders of magnitude (or a 10,000-fold dosage range)” and that “even the ‘preferred’ range of 0.01% to 1% is a hundredfold dosage range.” DCt. Op. at 609. The district court found that “[fjrom this large genus of potential treatments, Galderma selected 0.1% ada-palene as the concentration of adapalene with which to begin development of a topical treatment for acne.” Id. at 603. Dr. Shroot testified that the 0.1% dosage was considered the optimal dose for tolerance in a rabbit irritation study. Tr. at 1841:12-17.
The district court found that “[t]he broad disclosure of the Shroot patents provides no motivation or suggestion to select 0.3% adapalene for the treatment of acne.” Id. at 608-09. The correctness of these findings is not challenged by the panel majority.
The Verschoore article (1991)[3]
Verschoore (1991) discusses a Phase II clinical trial where 0.03% and 0.1% adapal-ene formulations, along with 0.025% treti-noin (a retinoid previously approved for topical use) were tested on the faces of patients with acne. The test data showed that the 0.1% adapalene formulation caused increased irritation compared to the 0.03% formulation. DCt. Op. at 604. Galderma’s expert testified that persons of ordinary skill in this art would view these data as suggesting that “a significant increase in tolerability measures” would result from a further tripling of the adapal-ene dose from 0.1% to 0.3%. Tr. at 1230:15-20.
The district court found, supported by the expert testimony, that “[t]he results of this study suggest that increasing the concentration of adap'alene beyond 0.1% would result in significantly increased irritation.” DCt. Op. at 604. My colleagues disagree with what they call the district ‘court’s “inference” that Verschoore (1991) and Ali-rezai (1996) (see infra) taught away from a further tripling of the dose. Thus my colleagues replace the testamentary and documentary expertise that supports the district court’s findings, with the, expertise of the panel majority.
The Alirezai article (1996)[4]
The district court found that “the trend of increased irritation between the 0.03% and 0.1% dosages disclosed in Verschoore (1991) was later confirmed in the same dosages in aqueous gels in a publication by Alirezai et al. entitled ‘Comparative Study of the Effectiveness and Tolerance of 0.1 and 0.03 Percent Adapalene Gels and of 0.025 Percent Tretinoin Gel in the Treatment of Acne.’ ” DCt. Op. at 604. The district court found that this article disclosed that “severe burning was seen in no patients treated with the 0.03% adapalene, but was seen in 13% of patients treated with the 0.1% adapalene aqueous gel” and that “significantly higher levels of ‘aver *744 age’ burning and itching after application were observed with the 0.1% formulation as compared to the 0.03% formulation.” Id. at 605.
' The district court found that “[t]his study, conducted on the faces of acne patients, demonstrates that the tolerability of the 0.1% dosage was different than the 0.03% dosage.” Id. The correctness of this finding is not challenged by my colleagues. In concluding that Alirezai (1996) does not teach away from the claimed invention, my colleagues ignore the district court’s finding that significantly higher levels of burning and itching were observed upon increasing the adapalene concentration of the formulation.
The Allec article (1997)[5]
This article, entitled “Skin Distribution and Pharmaceutical Aspects of Adapalene Gel,” is discussed by the district court as “describing] the results of in vivo models used to select the optimal concentration of adapalene for efficacy and safety ... ”. DCt. Op. at 605 (emphasis in original). The article concludes that “[b]ased on these in vivo results, 0.1% was considered as the optimal concentration of drug for adapalene gel. This choice was subsequently confirmed in clinical trials of safety and efficacy.” Id. at 606, quoting Allec (1997) at S123.
The district court found that “[a] person of ordinary skill in the art would have recognized these statements as a conclusion of the company that developed adapal-ene had determined, from all the data it had on hand, that 0.1% was the optimal concentration for acne treatment, balancing efficacy and safety.” Id. at 606. My colleagues concede, citing Allec (1997), that “the prior art indicated that many skilled artisans believed at the time of invention that 0.1% was the optimal concentration of adapalene for the treatment of acne.” Maj. op. at 742-43. My colleagues do not explain the grounds for their belief contrary to that of “many skilled artisans.”
The Verschoore article (1997)[6]
This article describes Phase I clinical trials conducted by Galderma on healthy subjects. The article states:
We carried out 13 different controlled, randomized, intraindividual comparison phase I studies in 339 healthy human volunteers to investigate the cutaneous safety of adapalene []. The irritation potential of adapalene 0.03%, 0.1%, and 0.3% gels was found to be low, whether tested under occlusive or nonocclusive conditions on a variety of sites, (face, chest, back, and buttocks).
Verschoore (1997) at S104. At the trial Tolmar stressed the testing by Verschoore of the 0.3% formulation. The district court found that “[t]he Phase I irritation test described in Verschoore (1997) was a screening test done on uncompromised healthy skin on the back as a prelude — not a substitute — to clinical testing on the face or on patients with disease.... A skilled person would understand that data from these Phase I studies conducted on healthy skin cannot be extrapolated to how the product will work in acne patients.” DCt. Op. at 610. The district court found that “Verschoore (1997) demonstrates that Galderma decided to pursue and obtain clinical approval for 0.1% adapalene. Further the mention of the 0.3% concentration in the article demonstrates to one skilled in the art that the 0.3% adapalene was *745 tried and rejected as the dosage to pursue for further clinical testing.” Id. at 606-07.
The district court received testimony from experts on both sides. Galderma’s expert testified that a skilled person would know that patch testing on the backs of healthy volunteers is a “poor predictor” of the irritation experienced by facial skin damaged by acne. Tr. at 1244:19-1245:6. Tolmar’s expert had previously written[7] that this type of irritation test “had failed to predict adverse reactions to skin damaged by acne or shaving, on sensitive areas such as the face.” DCt. Op. at 610 (emphasis in original). Although Tolmar’s expert stated a different opinion at trial, the district court found that the witness did not refute the views he had previously published on the non-predictive nature of patch tests on the backs of healthy individuals. Id. at 622.
These district court' findings are not challenged by my colleagues.
The Czernielewski article (2001)[8]
This article summarizes the results of adapalene studies including those reported in Alirezai (1996) and Verschoore (1997). The article explains that the “primary objective in the development of adapalene was to create a topical agent with retinoid therapeutic effects that is considerably less irritating than topical tretinoin.” DCt. Op. at 640. The court states: “Adapalene 0.1% became the standard concentration for subsequent adapalene formulations.” Id.
The district court found- that “[t]he Czernielewski article suggests that 0.1% adapalene is the optimal dose for the treatment of acne,” and that the article “does not disclose any information about any doses higher than 0.1% adapalene.” DCt. Op. at 607. My colleagues do not challenge the district court’s findings that the prior art, including Czernielewski (2001), shows that 0.1% was believed to be the optimal adapalene dose.
The Goldfarb article (2000)[9]
This article describes a study of the treatment of photodamaged skin with 0.1% and 0.3% adapalene formulations. The authors describe both of these adapalene concentrations as being “tolerated well.” DCt. Op. at 613.
The district court again received evidence and testimony from experts for both sides. Galderma’s expert explained the differences between photodamaged skin and skin with acne, and the different patient populations. Tr. at 1290:1-1293:1. The district court found that publications by Tolmar’s expert showed that “one of ordinary skill in the art would understand older skin with photodamage and actinic keratosis to be less sensitive to the reti-noid reaction compared to younger skin with acne.” Id. The expert’s contrary testimony at trial did not refute his prior published statements. Credibility findings are the particular province of the trial judge.
The district court found that the results of this study “are not predictive of how the same drug would affect patients with acne. One of ordinary skill in the art would know *746 that these results on photodamaged skin should not be extrapolated to acne.” Id. Without either acknowledging or disputing this finding, my colleagues cite Goldfarb as teaching that 0.3% adapalene can be used for “other conditions” without intolerable irritability. Maj. op. at 748.
The Euvrard article (2002)[10]
Euvrard (2002) describes a study using 0.1% and 0.3% adapalene to treat “actinic keratosis on the hands and forearms of organ transplant patients who were presumably on immunosuppressive drugs.” DCt. Op. at 614. The district court summarized the Euvrard conclusion that “[tolerance was excellent everywhere” and “[tjaking into account the good tolerance of adapalene, these results encourage further studies on the use of adapalene at ... higher dosage regimens.” Id.
There was expert testimony from both sides, and the district court found, as with Goldfarb, that “[djifferences exist between the properties of facial skin and skin on the extremities, such as the hands and forearms studied in Euvrard. Facial skin, more traditionally afflicted with acne, is much more prone to irritation and often thinner than skin on extremities.” Id. The district court found that “[bjased on these differences, one of ordinary skill in the art would not conclude from Euvrard that adapalene 0.3% gel would result in the same tolerability profile in patients with acne vulgaris.” Id.
The correctness of this finding is not disputed by my colleagues. Instead, without acknowledging or correcting the district court’s findings, my colleagues cite Euvrard (2002) as teaching the use of 0.3% adapalene for “other conditions” without intolerable irritability. However, the issue here is acne vulgaris, not “other conditions.”
Differin 0.1% Gel Data Sheet (1996)
Differin® is the trademark for Galder-ma’s adapalene products. The data sheet for 0.1% Differin cautioned against “over-dosage,” stating that: “If the medication is applied excessively, no more rapid or better results will be obtained and marked redness, peeling, or discomfort may occur.” DCt. Op. at 607. Galderma cited the overdosage warning as evidence of teaching away from higher adapalene concentrations. The district court did not appear to give weight to the data sheet, explaining that the warning was required by law. Id. at 642 n. 11 (citing 21 C.F.R. § 201.56).
The Bershad article (1999) [11]
This article describes a “roundtable” meeting of dermatologists. Referencing the commercial 0.1% adapalene product, Bershad (1999) states that “[ajlthough ada-palene is commonly believed to be one of the least irritating topical retinoids, the perception of many dermatologists is that this advantage is at least partially negated by a relatively lower efficacy compared with the other topical retinoids.” Bershad (1999) at 11. The district court did not discuss Bershad, although it is cited by the panel majority.
Tolmar contends that this article provides motivation to increase the concentration of adapalene. Galderma responds that this article does not show any expectation or understanding that the concentration of adapalene could be increased three-fold without the predicted irritating side effects. At trial, Tolmar’s expert *747 opined that this article suggested using doses of adapalene higher than 0.1%. Tr. at 1301:14-16. Galderma’s expert disagreed, stating that the authors were merely discussing the characteristics of the various available acne treatments. Tr. at 1301:21-23. This roundtable discussion does not render obvious the three-fold increase in dosage, when so many publications cautioned against the increased irritability of higher dosages.
The Jamoulle article (1989)[12]
This article describes a study involving the application of a formulation containing 0.3% adapalene to hairless rats. The district court did not discuss this article. The panel majority states that Jamoulle (1989) teaches the use of 0.3% adapalene to treat acne. Maj. op. at 742. However, results in hairless rats were not shown to establish dosage and tolerance on human skin, much less skin sensitized by acne.
II
The “Secondary Considerations”
Commercial Success
The district court found that despite late entry into a crowded market for treatment of acne, Galderma’s Differin® 0.3% gel quickly gained and maintained market share, despite an overall declining market. The district court agreed with Galderma that Tolmar seeks to sell the 0.3% formulation precisely because that formulation is preferred by consumers over the 0.1% formulation. The court found that the availability of cheaper generic 0.1% adapalene after the expiration of the Shroot patents did not appear to have affected consumer demand for the Differin® 0.3% product, whose market share and revenue were not explained by promotional activity, which had actually decreased. Clear error has not been shown in these findings.
My colleagues discount the factor of commercial success, arguing that the entry of 0.3% adapalene products, by Tolmar or others, had previously been blocked by the Shroot patents. Maj. op. at 740. However, the evidence in the district court was that the 0.3% product was successful against the 0.1% product and other acne medications. The district court did not err in including evidence of commercial success in its evaluation of the question of obviousness.
Teaching Away
The district court found, based on the prior art and the expert testimony presented by both sides, that the evidence as a whole taught away from increasing the concentration of adapalene above 0.1%. The district court found that “[t]he increased irritation observed in [Verschoore (1991) and Alirezai (1996) ] when tripling the concentration of adapalene from 0.03% to 0.1% effectively taught away from again tripling the concentration from 0.1% to 0.3%, given the potential for increased side effects.” DCt. Op. at 641-42.
The district court also found that Allec (1997), Verschoore (1997) and Czernielew-ski (2001) “would also have taught away from tripling the concentration of adapal-ene from 0.1% to 0.3%, which would have been a significant deviation from the then-understood optimal concentration.” DCt. Op. at 642. The court found that the experience of those skilled with other topical retinoids that had been approved for human use, such as tretinoin and tazaro-tene, further taught away from tripling of the concentration of adapalene. The court *748 explained that both tretinoin and tazaro-tene faced tolerability problems which required the manufacturers to decrease their concentration in products for the treatment of acne. Clear error has not been shown in these findings.
Unexpected Results
The district court found that it was unexpected that the tolerability profile of 0.3% adapalene was not statistically different from that of 0.1% adapalene. Tolmar had argued — and repeats on appeal — that at most the tolerability profile of 0.3% adapalene represents a difference in degree, not in kind. However, based on expert testimony from both sides, the district court found that “[w]hereas the prior art suggested a dose-dependent, clinically meaningful increase in side effects would result from increasing the concentration of adapalene from 0.03% to 0.1%, the claimed inventions achieved a difference in kind by discontinuing that trend.” Id. at 643.
The district court explained that differences in degree occur when the invention is merely a continuation of a trend previously described in the prior art. Id. at n. 14 (citing In re Huang, 100 F.3d 135 (Fed. Cir.1996); Iron Grip Barbell Co., Inc. v. USA Sports, Inc., 392 F.3d 1317, 1323 (Fed.Cir.2004)). Here, the prior art showed a trend to increased adverse side effects with increased concentration, while Galderma’s products violated that trend. This was a difference in kind, not in degree.
Clear error has not been shown in these findings, all of which are discounted or ignored by the panel majority.
111
The Decision At Trial
The district court considered all of the evidence and argument, and concluded that the claims to the 0.3% adapalene formulations had not been proved invalid by clear and convincing evidence. The court acknowledged Tolmar’s argument that obviousness should be presumed: Tolmar argued that “because 0.3% adapalene falls within the 0.01%-1.0% range previously disclosed in Galderma’s Shroot patents the claimed inventions are prima facie obvious,” and that “‘evidence of secondary considerations simply cannot overcome the presumption’ of obviousness.” DCt. Op. at 637 (quoting Tolmar’s trial brief). The district court, unlike the panel majority, correctly recognized that a prima facie showing is not a presumption of obviousness, and does not change the placement of the burden of proof. The district court recited:
Recently, the Federal Circuit rejected such an approach to obviousness in the context of litigation. The Federal Circuit noted that the Supreme Court “has never spoken in terms of a legally rebut-table presumption with respect to obviousness;” nor has it provided any “indication that it believes the burden of persuasion should shift to the patentee at [any] point to prove nonobviousness.”
DCt. Op. at 637-638 (quoting In re Cyclo-benzaprine Hydrochloride Litigation, 676 F.3d 1063, 1078 (Fed.Cir.2012)).
The district court correctly explained that “the proper analysis of obviousness under 35 U.S.C. § 103 requires that ‘all evidence relevant to obviousness or nonob-viousness be considered, and be considered collectively,’ without resort to presumptions of prima facie obviousness or burden-shifting.” DCt. Op. at 638 (quoting Cyclobenzaprine, 676 F.3d at 1078). This is the correct standard, established in Graham v. John Deere and reiterated consistently and exhaustively.
The dispositive findings in this case, viz. the content of the prior art, whether the *749 prior art taught away, whether the invention produced unexpected results, and whether there was commercial success, involve factual inquires that must be accepted on appeal unless clearly erroneous. See In re Applied Materials, Inc., 692 F.3d 1289, 1294 (Fed.Cir.2012) (“Obviousness is a question of law with several underlying factual inquiries, including what a reference teaches, whether a reference teaches away, and whether there is commercial success.”) (citing Graham v. John Deere Co. of Kan. City, 383 U.S. 1, 17-18, .86 S.Ct. 684, 15 L.Ed.2d 545 (1966)). Clear error has not been shown in the district court’s findings. Instead, on highly selective snippets of the information that was before the district court, my colleagues simply make their own findings.
The burden of overcoming a district court’s factual findings is heavy. See Anderson v. Bessemer City, N.C., 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (“Where there are two permissible views of the evidence, the factfinder’s choice between them cannot not be clearly erroneous.”). Based on the expert testimony, the documentary evidence, and the factual findings of teaching away, unexpected results, and commercial success, the district court concluded that Tolmar failed to prove by clear and convincing evidence that the inventions of the patents-in-suit would have been obvious to a person of ordinary skill in the field of the inventions. For the reasons discussed by the district court, the judgment requires affirmance.
Tolmar was required to provide clear and convincing evidence that the selection of 0.3% from within the broad range in the prior art was obvious in view of the entirety of the evidence. The evidence at trial was that the increase in adapalene concentration was viewed skeptically, and that the combination of efficacy and safety of the 0.3% dose was unexpected to the experts. The experts at trial agreed that the beneficial combination of properties of the 0.3% dose could not have been predicted in advance — indeed the opposite was predicted. The resultant product was commercially successful despite the cheaper prior product at lower dosage.
The panel majority mentions but does not apply the presumption of validity. My colleagues hold that for inventions “where there is a range disclosed in the prior art, and the claimed invention falls within that range,” the burden falls upon the patentee to support patentability. Maj. op. at 744. This is not just a shift in the burden of production; the majority never requires that Tolmar meet its burden of persuasion. Instead, once Tolmar had demonstrated that the invention fell within a broad range disclosed in the prior art, according to the panel majority, Tolmar met its evidentiary burden. My colleagues do not require that the prior art provide some reason for selection of the patented embodiment. Instead, the court places the burden of “rebuttal” on the patentee, and limits rebuttal to the “secondary considerations.”
The panel majority also makes creative new rules, ruling that patentability is negated “where the modification of the percentage is within the capabilities of one skilled in the art at the time.” Maj. op. at 746. The holding that since “skilled artisans were capable of adjusting the percentage,” the product containing 300% more active ingredient, “although unexpected” in properties, id., is unpatentable, is new and incorrect law. A skilled artisan will nearly always be “capable” of adjusting a percentage of an ingredient; this fact does not render unexpected results not probative of unobviousness.
Thus the court places new obstacles in the path of improvement patents, a change of law that is particularly pernicious in the arts where small differences may have *750 large consequences or benefits. This rule is of further mischief now that the nation has adopted a first-to-file law with its pressures for early filing, possibly before all embodiments have been fully explored.
The district court applied the correct law to a vast body of evidence, most of which is not discussed by the panel majority. The district court properly applied statute and precedent. From my colleagues’ inappropriate rulings, I respectfully dissent.

. Galderma Laboratories, L.P. v. Tolmar, Inc., 891 F.Supp.2d 588 (D.Del.2012) (“DCt. Op.”).

. U.S. Patent Nos. 4,717,720; 5,098,895; Reissue Patent No. 34,440.

. Verschoore et al., Efficacy and Safety of CD 271 Alcoholic Gels in the Topical Treatment of Acne Vulgaris, 124 British J. of Derm. 368-71 (1991).

. Alirezai et al., Comparative Study of the Effectiveness and Tolerance of 0.1 and 0.03 Percent Adapalene Gels and of a 0.025 Percent Tretinoin Gel in the Treatment of Acne, 123 Ann. Dermatol. Venereol. 165-170 (1996).

. Allec et al., Skin Distribution and Pharmaceutical Aspects of Adapalene Gel, 35(6), J. Am. Acad. of Dermatol. S119-S125 (1997).

. Verschoore et al., Adapalene 0.1 % Gel Has Low Skin Irritation Potential, 36(6) J. Am. Acad. of Dermatol. S104-109 (1997).

.Saqib J. Bashir & Howard I. Maibach, Methods for Testing the Irritation and Sensitization Potential of Drugs and Enhancers, in Biochemical Modulation of Skin Reactions: Transdermals, Topicals, Cosmetics 45, 50 (Agis F. Kydonieus & John J. Wille eds., 2000).

. Czernielewski et al., Adapalene Biochemistry and the Evolution of a New Topical Retinoid for Treatment of Acne, 15 (Suppl.3) J. Eur. Acad. Dermatol. Venerol. 5-12 (2001).

. Goldfarb, Using Adapalene to Treat Photo-damage, Supp. to Skin & Aging 4-7 (Nov. 2000).

. Euvrard, How Adapalene Can Treat Actinic Keratoses, Supp. to Skin & Aging 12-15 (Nov. 2000).

. Bershad et al., Topical Retinoids in the Treatment of Acne Vulgaris, 64 (Suppl.2) Cutaneous Med. for the Practitioner 8-19 (Aug. 1999).

. Jamoulle et al., Follicular Penetration, Distribution and Migration of CD271, a New Nap-thoic Acid Derivative for Topical Acne Treatment, 3 Pharmacol. & the Skin 198-200 (1989).